J-S51003-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 693 MDA 2019 |

Appeal from the Decree Entered March 28, 2019
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s):  A-8786

| | | |
|---|---|---|
| IN THE INTEREST OF: S.L.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 694 MDA 2019 |

Appeal from the Decree Entered March 28, 2019
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s):  A-8784

| | | |
|---|---|---|
| IN THE INTEREST OF:  A.M.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 781 MDA 2019 |

Appeal from the Decree Entered March 28, 2019
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s):  A-8782

BEFORE:  PANELLA, P.J., GANTMAN, P.J.E., and MUSMANNO, J.

MEMORANDUM BY PANELLA, P.J.:                    **FILED: NOVEMBER 22, 2019**

J.K. ("Mother") appeals from the decrees entered March 28, 2019, that granted the petition of the Luzerne County Children & Youth Services ("CYS"), and involuntarily terminated her parental rights to her daughter, A.M.R. (born April 2005), son D.R. (born January 2007), and daughter S.L.R. (born January 2008) (collectively "Children").[1]  After careful review, we affirm.

The family first came to the attention of CYS in July 2011, when Children were placed in foster care until September 2012. Children were reunited with Mother at that time, but were again removed from her care and put in placement from October 2014 through August 2016. At that time, they were reunited with Mother, although CYS did not close out the case. Permanency review hearings were held in April 2016 and October 2016.

On December 23, 2016, Mother refused urinalysis and admitted to the use of Percocet, methamphetamine, Vicodin, and amphetamine. A shelter care order was issued and Children were removed from her custody.

On January 4, 2017, Children were adjudicated dependent. Permanency review and status hearings were held in April 2017, July 2017, December 2017, and June 2018. On October 4, 2018, CYS filed a petition seeking to involuntarily terminate Mother's parental rights to Children.

The court held hearings on the petition on January 15, 2019, and January 18, 2019, and on Children's goal change to adoption. On March 27,

---

[1] G.R. ("Father") is deceased.

2019, the court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

Mother timely filed notices of appeal and statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issue for our review:

A. Whether the trial court erred in terminating parental rights and/or abused its discretion as testimony offered did not establish by clear and convincing evidence the requirements of the Adoption Act of 1980, October 15, P.L. 934, No. 163, 1, 23, Pa C.S.A. Section 2511(a)(2)[, ](5) and (8) in that [Mother] has not caused the [Children] to be without essential parental care, control, or subsistence necessary because she has engaged in court-ordered services that have remedied the circumstances that originally gave rise to [Children's] placement[?]

B. Whether the trial court erred in terminating parental rights and/or abused its discretion in giving primary consideration to 23 Pa.C.S.A. Section 2511(b) to the developmental, physical, and emotional needs and welfare of [Children] because it has been demonstrated by testimony that there was insufficient evidentiary support for the court's decision that the best interests of [Children] be served by terminating [Mother's] parental rights[?]

**See** Mother's Brief at 3 (unnecessary capitalization and proposed answer omitted).

We review cases involving the termination of parental rights according to the following standard.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

Termination requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we will focus our analysis on Section 2511(a)(2) and (b), which provides as follows:

> **(a)  General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *See In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Id.* Further, "evidence concerning a parent's ability to care for another child is irrelevant and

inadmissible in a proceeding to terminate parental rights with regard to the child at issue." **In re A.L.D.**, 797 A.2d 326, 338 (citations omitted).

Mother argues that CYS did not prove by clear and convincing evidence that her rights should be terminated pursuant to subsection (a)(2) because she has been involved in drug and alcohol treatment since the inception of the case. **See** Mother's Brief at 25. She contends that no further treatment was ordered despite the fact that she returned positive screens and had self-admitted relapses. **See id**. Mother further argues that she continued attending trauma therapy throughout the life of the case. **See id**. at 26. Finally, Mother argues that she could not complete her parenting classes because the provider would not work with her due to her lack of stable housing. **See id**. Mother argues that she did have housing and the parenting provider did not follow up on that fact. **See id**. Mother therefore argues that she remedied the circumstances leading to placement.

At the hearing on January 18, 2019, CYS presented the testimony of Lynn Lesh, CYS caseworker. Mother testified on her own behalf and presented the testimony of L.S., a friend and former coworker and roommate, and R.K., her own father and Children's maternal grandfather. The dependency dockets were admitted into the record with no objections.

Lynn Lesh, the caseworker for the family, testified that Children are placed together in a foster home since March 2017 with T.F. and R.F. ("Foster parents"). **See** N.T., 1/18/19, at 4. Children reside in the home with their minor cousins, another foster child, and an adopted child. **See id**. Additionally,

Children get along very well with the other children in the household. ***See id***. at 18. Children have been well assimilated into the foster family: their pictures are all over the house; they have their rooms set up; they attend activities, vacations, and family gatherings with foster parents; they perform chores around the house. ***See id***. at 4-5. Foster parents fill all of the physical needs of Children by providing shelter, clothing, food, and taking them to medical and counseling appointments; providing for their developmental needs with extra-curricular activities; and addressing their emotional needs by providing comfort to Children, loving them, praising them, and disciplining them when necessary. ***See id***. at 5-6.

Foster parents provide Children with structure, which is necessary, as all three Children have been diagnosed with post-traumatic stress disorder (PTSD), attention deficit hyperactive disorder (ADHD), and oppositional defiant disorder (ODD). ***See id***. at 6, 19. Previously, Mother would call Lesh several times a week asking her to get Children to go to bed, because they would not, and Mother was afraid they would be evicted from the shelter in which they were residing. ***See id***. at 21-22.

Paul Dorang, a case manager for Family Service Association testified as to his efforts to help Mother resolve her issues and reunify her with her children. ***See*** Mother's Brief, at 6. He worked with Mother in 2017. ***See id***. Dorang observed Mother's visits with Children and opined that they were "chaotic." ***Id***. at 7.He believed that the difficulties in the visits arose from Mother's inability to set boundaries or control the Children's behavior, but

acknowledged that the Children's traumatic experiences played a role in their behavior. *See id*. at 7-8.

Dorang stated that Mother did not successfully complete the program and her case was closed due to noncompliance, lack of progress, and failure to maintain sobriety. *See id*. at 7.

Consistent with the foregoing, we discern no error in the trial court's finding that clear and convincing evidence supported the termination of Mother's parental rights pursuant to Section 2511(a)(2), based upon Mother's continued incapacity – namely, her inability to complete her goals for reunification over the twenty-five months that Children were placed – that resulted in Children being without essential parental care, the cause of which "cannot or will not be remedied." *See Lilley*, 719 A.2d at 330; *Z.P.*, 994 A.2d at 1117.

Next, we must consider whether Children's needs and welfare will be met by termination pursuant to Subsection (b). *See Z.P.*, 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

We have stated:

> [b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible

dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, 994 A.2d at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Additionally, the court may emphasize the safety needs of a child. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Mother argues that the Agency has not proven that it would not be detrimental to sever the parent-child bond. *See* Mother's Brief at 29. She contends that she never had an issue parenting Children and that there were no safety concerns regarding Children, and that Children wish to return home. *Id.*

Lesh testified that Mother and Children visit twice a week at the Agency. *See* N.T., 1/18/19 at 6. Although they enjoy spending time with Mother, the

bond is more of a "companionship bond" where Mother has no parental role. *Id.* Children do not go to Mother for things they need, they go to their foster mother. *See id*. In contrast, Children are bonded with their foster parents and that bond is parental. *See id*. at 7.

Since being placed with Foster parents, Children's grades are phenomenal and they have a comfortable structure in their home. *See id*. at 8-9. They have made friends in school and attend birthday parties. *See id*. Foster mother is attempting to teach Children responsibility to take their own medication and dress appropriately. *See id*. at 12.

Lesh did not believe the termination of Mother's parental rights would have a detrimental effect on the minor Children, because termination would continue to provide them with the structure, stability, and safety that they have right now. *See id*. at 7-8. Children indicated to Lesh that their "biggest fear" was that if they went back to Mother, they would again be removed and have to start over in another placement as they had done many times before. *Id*. at 8. Children would like to be adopted, but maintain contact with Mother, and foster parents are willing to have open contact with Mother. *See id*. at 13-14, 19.

Mother testified that Children love her house, their rooms, and that they constantly ask if they can come home. *See id*. at 23. Mother stated she has re-done Children's rooms for them. *See id*.

L.S. testified that she met Mother at a previous job in 2010, and has known her nine years. *See id*. at 25. They became friends, and L.S. lived with

Mother and Children for approximately six months in 2011. *See id*. L.S. testified that Mother always had good interaction with Children and was very patient with them when they "got hyper," and was compassionate and caring. *Id*. at 26. L.S. also accompanied Mother to several visits with Children after they had been removed from Mother's custody, and the visits went well. *See id*. She believed it was in Children's best interest to be with their mother, and that there were no safety concerns in Mother's home. *See id*. at 27-28.

L.S. stated that she knew Mother was previously addicted to drugs, but has sought help for her addiction and was prescribed pain medication by doctors. *See id*. at 28-29. L.S. was aware of Mother's methamphetamine use as recently as December 2018. *See id*. at 29. L.S. admitted it would be a safety concern if Mother used drugs in front of Children, but insisted that Mother was not currently using drugs. *See id*. at 30-31.

R.K. testified that he is Mother's father and Children's maternal grandfather, and that he had a good relationship with Children when Mother had custody. *See id*. at 35. He testified that, from what he observed, Mother was a good mother. *See id*. Children were always clothed, fed, and in school, and, during holidays, Mother went out of her way to make sure they were taken care of. *See id*. at 36. R.K. testified he is the custodian of Mother's older child, A.K., who is eighteen years old. *See id*. at 39. A.K. came into R.K.'s custody when he was five years old, because Mother was busy raising the other three Children. *See id*. R.K. was aware that Mother was using illegal drugs in the past, but that she was not using anymore. *See id*. at 41-43. The

last time he saw Children was December 2018, and it had been a few years before that since he had last seen them. *See id*.

Here, we can find no fault in the trial court's assessment of the evidence before it. The court credited Lesh's testimony that showed that termination best served Children's needs and welfare. Further, the evidence was sufficient to establish that Children's emotional, physical, and developmental needs are taken care of in their foster parents' home. In that home, they have a loving, stable family where they were doing well in school and are disciplined appropriately.

Testimony established that the bond Children have with Mother is not parental so much as it is that of companions or friends, and that the parental bond Children currently have is with their foster parents. Foster parents are additionally open to allowing continued contact between Mother and Children. Under these circumstances, the trial court was justified in finding that Children would not be harmed by termination of their bond with Mother. All of the testimony established that, for Children to know any sort of permanency or stability, Mother's rights must be terminated.

Accordingly, clear and convincing evidence supports the trial court's termination of Mother's parental rights under Section 2511(a)(2) as well as the Section 2511(b) finding that any bond between Children and Mother is outweighed by the fact that adoption would best serve Children's needs and welfare. *See Z.P.*, 994 A.2d at 1126-27; *K.Z.S.*, 946 A.2d at 763.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/22/2019</u>