J-A23011-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.S.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 493 EDA 2020 |

Appeal from the Order Entered January 9, 2020,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s): CP-51-AP-0000305-2018.

| | | |
|---|---|---|
| IN THE INTEREST OF: S.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 494 EDA 2020 |

Appeal from the Order Entered January 9, 2020,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s): CP-51-AP-0002362-2013.

BEFORE:   KUNSELMAN, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED DECEMBER 09, 2020**

In this consolidated matter, S.F. (Mother) appeals from the order involuntarily terminating her rights to her seven-year-old son S.S.F. (Child),

---

[*] Retired Senior Judge assigned to the Superior Court.

pursuant to the Adoption Act. *See* 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).[1]  Mother also appeals the decision to change the goal of the dependency proceedings from reunification to adoption pursuant to the Juvenile Act. *See* 42 Pa.C.S.A. § 6351. After review, we affirm.

The relevant history is as follows.  Mother gave birth to Child in 2012. At that time, Mother was 15 years old and already involved with Philadelphia Department of Human Services (DHS).  In November 2013, Mother told her case manager that she was overwhelmed, and she expressed that she might hurt herself or Child.  The court removed Child from Mother's care and adjudicated Child dependent in December 2013.

After approximately 18 months of reunification services, including mental health treatment, the court ordered reunification in June 2015, with certain conditions.  Mother's progress continued, and the court discharged DHS supervision and the dependency petition by January 2016.

In August 2016, DHS received a report that Child was not safe.  Mother and Child had been residing at a facility for mothers and young children under a court order.  Mother told the facility staff that Child ingested a cleaning product.  Child received medical attention and appeared healthy.  However, in September 2016, Mother expressed that she could not care for Child and wanted the former foster mother to adopt Child.  The court adjudicated Child dependent for a second time and removed Child from Mother's care.

---

[1] The court also terminated the parental rights of the unknown father.

- 2 -

Mother evidently vacillated in her desire to relinquish her parental rights. The dependency case proceeded with concurrent reunification and adoption goals. Although Mother was offered unsupervised visitation, she was inconsistent with her visits throughout 2017. By January 2018, Mother appeared ready to relinquish her rights, but in February 2018, Mother changed her mind.

The dependency case proceeded for approximately two more years, during which time Mother was mostly non-compliant with her permanency goals. In December 2019, DHS re-filed its petition to involuntarily terminate Mother's rights. The court held a hearing on January 9, 2020. By this point, Child was 7 years old. The court granted the petition and terminated Mother's rights under Section 2511(a)(1), (2), (5), (8) and (b). Furthermore, the court ordered that the "new permanent placement goal" be designated to "adoption," notwithstanding the fact that goal of the dependency proceedings was concurrent reunification with adoption. **See** Order of Court, 1/9/20, at 1. Mother timely-filed this appeal.

She presents the following issues for our review:

1. Did the trial court err in terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8)?

2. Did the trial court err in finding that termination of Mother's parental rights best served [Child's] developmental, physical and emotional needs under 23 Pa.C.S.A. § 2511(b)?

3. Did the trial court err in changing [Child's] goal to adoption?

Mother's Brief at 4.

We review these claims mindful of our well-settled standard or review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotations marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation and quotation marks omitted).

In this case, the court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a), as well as Section (b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We begin with the first prong of the termination analysis under Section 2511(a). Specifically, we analyze the court's decision under Section 2511(a)(2).

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> […]
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

Regarding Section 2511(a)(2), we have explained:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse,

neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citations, internal quotation marks, and indentation omitted).

Regarding Section 2511(a)(2) analysis, Mother limits her argument to the third element. She summarily contends she satisfied her housing, mental health treatment, and employment goal, and thus she concludes that remedied the conditions that caused Child to be without parental care. *See* Mother's Brief at 12-13.

In its Pa.R.A.P. 1925(a) opinion, the court thoroughly explained why it reached the opposite determination:

Throughout the time that Child has been in DHS custody, Mother's SCP [(Single Case Plan)] objectives were to cooperate with CUA [(Community Umbrella Agency)] services; mental health; housing; complete random drug screens; participate in Child's medical appointments; complete a bonding and parenting capacity evaluation; and visitation. On multiple occasions throughout the life of the case, the trial court advised Mother of her objectives. SCPs are also mailed out to Mother after each revision.

Since July 2019, CUA has not known the status of Mother's compliance with her mental health objective. As part of Mother's mental health objective, Mother is to participate in therapy and medication management. In July 2019, Mother informed a counselor at the Wedge[, a service provider,]

- 6 -

that she did not want CUA to know the status of her treatment. Mother also refused to sign consent forms to allow CUA to monitor her mental health treatment. Mother claimed that she did not refuse to sign consent forms and signed the forms last year. Mother has not permitted CUA to assess her home since before July 2019. Mother has not provided CUA with her lease. When CUA spoke with Mother's landlord, the landlord indicated that Mother did have a lease, but it was not up-to-date. CUA is unaware of the occupants of the home, other than Mother. CUA has not been able to establish if Mother's current home is appropriate and safe for Child.

Following the permanency review hearing on July 15, 2019, Mother was ordered to complete a forthwith drug screen and three random drug screens. Mother failed to complete either the forthwith drug screen or any of the random drug screens. Mother has not participated in any of Child's medical or dental appointments. Although Child is receiving mental health care, Mother has not made any attempts to contact Child's provider.

Mother has not completed either the bonding or the parenting capacity evaluations. Both evaluations require access to documentation of Mother's mental health treatment history and Mother refused to sign the necessary consents for either evaluation to be completed. Since Mother failed to sign the necessary consents, CUA was unable to refer Mother to the bonding or parenting capacity evaluations. Mother claimed she was never asked to attend either a bonding or parenting capacity evaluation.

At the permanency review hearing on July 15, 2019, Mother was ordered to attend supervised visits with Child once a week for two hours. Mother has not attended a visit with Child since June 25, 2019. Mother has not made any attempts to visit with Child since the last visit she attended. Mother has failed to contact CUA or the visitation coach to schedule a visit with Child. Between July 2019 and August 2019, there were seven scheduled supervised visits, but Mother did not attend any of those visits. At trial, Mother claimed she called the CUA case manager and the visitation coach on multiple occasions to schedule visit[s], but never heard back. At the permanency review hearing on October 7, 2019, the trial court reduced Mother's supervised

- 7 -

visitation to biweekly after Mother failed to attend any visits with Child since the previous review hearing.

Throughout much of the life of this case, Mother was a minor. Mother's board extension for her dependency matter was discharged [in] June [] 2018.[2] CUA made multiple referrals for Mother to attend ARC for employment, but CUA is unaware if Mother has appropriate employment because Mother has been uncooperative. Mother stated that she works two jobs in home health care. When asked about paystubs, Mother claimed that she could not find the paystubs that would verify her employment.

Since July 2019, Mother has not availed herself and has been unwilling to cooperate with CUA. CUA has not had any contact with Mother since July 23, 2019. Since the permanency review hearing on October 7, 2019, CUA has attempted to make outreach to Mother on at least 12 occasions. Mother claimed she has never received any contact from the CUA case manager, either via telephone or mail. Additionally, Mother claimed that she did not avail herself to CUA because individuals from CUA were abusing her. Mother asserted that the visitation coach became physically violent with Mother and that she was protecting herself by not availing herself to CUA. Mother presented no evidence to substantiate her claims.

Although Mother maintained some level of compliance throughout the time that Child re-entered DHS care in 2017, Mother's compliance with her objectives has diminished. Mother has been non-compliant with her objectives as of October 7, 2019. Child needs permanency, which Mother cannot provide. The conditions and causes of Mother's incapacity cannot or will not be remedied by Mother. Child was originally adjudicated dependent on December 5, 2013. Child returned to Mother's care on June 12, 2015, but was adjudicated dependent again on September 22, 2016. Child has been in DHS care for a total of fifty-seven months since he first entered care and thirty-nine months consecutively since the most recent adjudication. Mother's refusal to engage in her SCP objectives remains a barrier to

_____

[2] Evidently, Mother's own dependency was extended until she reached 21 years of age.

- 8 -

reunification and renders Mother unable to provide essential parental care, control, and subsistence necessary for Child['s] physical and mental well-being. The DHS witnesses were credible. Termination under 23 Pa.C.S.A. § 2511(a)(2) was proper.

Trial Court Opinion (T.C.O.), at 16-18 (citations to the record omitted) (formatting altered) (footnote added).

Beyond citations to her own testimony, Mother cites neither the record, nor relevant legal authority to refute these findings. Mother's argument depends on whether the court found Mother's testimony more credible than the testimony of DHS witnesses. As we stressed above, we do not second-guess the orphans' court's credibility determinations so long as they are supported by the record. *See In re T.S.M.*, 71 A.3d at 267. Moreover, appellate courts "are not in a position to make close calls based on fact-specific determinations," particularly in juvenile cases where the lower court judge, who presides over multiple hearings with the same parties, possesses "a longitudinal understanding of the case." *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We conclude the court did not abuse its discretion when it determined DHS satisfied all three elements of the Section 2511(a)(2) analysis.

Having concluded that termination was warranted under Section 2511(a), we address whether termination best served Child's needs and welfare under Section 2511(b). Regarding this portion of the analysis, we have previously stated:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, section 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

Parental rights may be terminated notwithstanding the existence of a parent-child bond. When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1992).

Instantly, Mother concedes that she had not visited with Child "for a period of time[.]" *See* Mother's Brief at 17. However, she argues that Child

had previously expressed a desire to return to Mother's care, and she concluded that she and Child have a loving relationship which benefits him. *Id.*

The trial court disagreed. Again, we observe the trial court's explanation of why it found termination was warranted:

> Child is currently placed in a pre-adoptive foster home. Child's behavior has been of concern, including display of defiance, impulsivity, and showing a flat affect. On multiple occasions, Child would appear happy in one moment and then immediately disassociate. Since Child's placement in the current foster home approximately six months prior to the termination and goal change trial, Child has been observed communicating more openly, engaging with the foster family, beginning to smile, laughing, and joking. Child is the only child in the foster home. The foster home hosted a birthday party for Child [in] November 2019. It was observed that many extended family members attended the birthday party and Child interacted with those family members. Child is regularly in contact with the extended family members. Foster Mother has been assisting in bringing Child to medical appointments. Child's relationship with Foster Mother has been growing in a positive manner. Child refers to Foster Mother as either "Miss T" or "Mom." Foster Mother has not heard from Mother since July 2019. Although Child has behavioral issues, none of his issues appear to be rooted from not seeing Mother since June 2019. Child does not share a positive, health[y] maternal relationship with Mother. Child would not suffer any irreparable harm if Mother's parental rights were terminated.
>
> [Child's legal counsel] represents Child's legal interests. Legal Counsel spoke with Child, a seven-year-old boy, regarding his wishes. Legal Counsel expressed that there was difficulty communicating with Child because he was slow to warm up to others, although Legal Counsel made progress after they read a book together. Child stated that he wants to remain in his current foster home. Legal Counsel was not able to discuss Child's wishes regarding

adoption. Legal Counsel originally began representing Child's legal interests when a previous petition for involuntary termination and goal change was filed in 2018. In 2018, Child expressed his desire to be reunified with Mother, but as of Legal Counsel's most recent visit with Child, Child's desires have changed.

Child is under twelve years old, and at this age under the Adoption Act, his consent to adoptions is not required. Consequently, the fact that Legal Counsel was not able to discuss his wishes as to adoption is not detrimental to giving more weight to Child's preference to remain in his current foster home in light of the record establishing that Mother has not visited since June 25, 2019. As a result, the trial court determined that Mother and Child share no parental bond. [....] The DHS witnesses were credible. The trial court's termination of Mother's parental rights to Child under 23 Pa.C.S.A. § 2511(b) was proper and there was no error of law or an abuse of discretion.

T.C.O. at 25-27 (citations omitted) (formatting altered).

In our review, we agree with the trial court's determination. Although the bond analysis is "a major aspect of the Section 2511(b) best interest analysis, it is nonetheless only one of many factors to be considered by the [orphans'] court when determining what is in the best interest of the child." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted). The question is not whether a bond exists, but whether termination would destroy a necessary and beneficial bond. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "[I]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re Q.R.D.*, 214 A.3d 233, 243 (Pa. Super. 2019) (citation omitted). Moreover, "[c]ommon sense dictates that courts considering termination must also

consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **T.S.M.** 71 A.3d at 268.

Here, while Mother did not cooperate with a formal bonding evaluation, we do not ignore the relationship between Mother and Child, if only from observing the Child's age and placement history. As Mother notes, Child sought to return to Mother's care as recently as 2018. But the mere existence of a bond – if that is what this case indicates – is not the end of the analysis. Once a bond between parent and child is detected, the court "must consider the effect of severing that bond on the child before concluding whether termination is proper." **See, e.g., In re: Adoption of R.J.S.**, 901 A.2d 502, 511-512 (Pa. Super. 2006).

The record supports the court's decision that Child would not suffer any adverse effect as a result of severing the relationship between Mother and Child. During the final six months of the dependency case, Mother refused to visit Child; meanwhile, Child turned to foster mother for necessary support and began identifying her as his parental figure. In the foster mother's care, Child's behavior improved, evincing the positive effects the placement had on his development. Moreover, Mother's Brief provides no substantial argument regarding how the court abused its discretion, nor does she provide any support as to how she and Child share a healthy, beneficial relationship beyond her contention that Child previously desired to return to her care in 2018. Mother does not contest that Child now desires to remain with the foster mother. And in the foster mother's care, Child's needs for security and

stability are finally being met. We conclude the court did not abuse its discretion when it determined termination best served Child's needs and welfare.

Having concluded that termination was proper, we briefly address Mother's third and final appellate issue. In her Brief, Mother claims the court erred when it changed the permanency goal from reunification to adoption. Although this claim appears in Mother's concise statement of errors complained of on appeal (Pa.R.A.P. 1925(b)), as well as her statement of questions involved (Pa.R.A.P. 2116(a)), Mother evidently decided to abandon the issue on appeal. She does not address the issue at all in the argument section of her brief, in contravention of Pa.R.A.P. 2119. We conclude Mother waived this issue. *See In re R.D.*, 44 A.3d 659 (Pa. Super. 2012); *see also In re K.L.S.*, 934 A.2d 1244, 1246 n.3 (Pa. 2007) (When the appellant has failed to preserve the issues for appeal, the issues are waived, and the lower court's order is more properly 'affirmed.'").[3]

Orders affirmed.

---

[3] Even accepting for the sake of argument that Mother did not waive this issue, we would conclude that it is moot in light of our decision to affirm the court's termination order. *See Interest of D.R.-W.*, 227 A.3d 905, 917 ((Pa. Super. 2020) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force of effect") (citation omitted); *see also Interest of J.L.*, 216 A.3d 233, 237 (Pa. Super. 2019) ("[A]n actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot.").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/9/20